## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V., <br><br> *Plaintiffs*, <br><br> PRODUCTOS LAMINADOS DE MONTERREY S.A. DE C.V., <br><br> *Plaintiff-Intervenor*, <br><br><br> v. <br><br> THE UNITED STATES, <br><br> *Defendant*, <br><br> NUCOR TUBULAR PRODUCTS INC., <br><br> *Defendant-Intervenor*. | <u>**NON-CONFIDENTIAL VERSION**</u> <br><br> **Court No. 1:25-cv-00176-JCG** <br><br><br> Confidential Business Proprietary Information Deleted from Pages of the 56.2 Brief: 7, 18, 28, 37, 41–44. |

<u>**PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2 OF THE RULES OF THE U.S. COURT OF INTERNATIONAL TRADE**</u>

Pursuant to Rule 56.2(c) of the Rules of the U.S. Court of International Trade, Plaintiffs Maquilacero S.A. de C.V. ("Maquilacero") and Tecnicas de Fluidos S.A. de C.V. ("TEFLU") (Maquilacero and TEFLU, collectively, "Maquilacero/TEFLU") by and through their attorneys, respectfully move this Court for an Order granting their Motion for Judgment on the Agency Record.

This motion challenges certain aspects of the final results issued by the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping duty order on light-walled rectangular pipe and tube ("LWRPT") from Mexico for the period of review August 1, 2022 to July 31, 2023 (the "POR"), which resulted in a dumping margin of 13.04% *ad valorem* for Maquilacero/TEFLU.  *See Light-Walled Rectangular Pipe and Tube from Mexico:*

*Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 25232

(Dep't Commerce June 16, 2025) ("*Final Results*") (P.R. 172), and accompanying Issues and

Decision Memorandum ("I&D Mem.") (P.R. 171), as amended by *Light-Walled Rectangular*

*Pipe and Tube and Mexico: Amended Final Results and Partial Recission of Antidumping Duty*

*Administrative Review; 2022-2023*, 90 Fed. Reg. 38751 (Dep't Commerce Aug. 12, 2025) (P.R.

186); *see generally Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic*

*of China, and the Republic of Korea: Antidumping Duty Orders; Light-Walled Rectangular Pipe*

*and Tube from the Republic of Korea: Notice of Amended Final Determination of Sales at Less*

*Than Fair Value*, 73 Fed. Reg. 45403 (Dep't Commerce Aug. 5, 2008) (the "*Order*").

Commerce's *Final Results* are reviewable under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I),

1516a(a)(2)(B)(iii), and 1516a(g)(3)(A)(i).  The U.S. Court of International Trade has

jurisdiction over this matter under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iii).

For the reasons detailed in Maquilacero/TEFLU's accompanying Brief, which is

incorporated into this motion by reference, Commerce's *Final Results* are unsupported by

substantial evidence on the record and otherwise not in accordance with law.

Maquilacero/TEFLU respectfully request that this Court reverse the reverse the challenged

determination and remand with instructions for Commerce to reconsider: (1) Commerce's

construction and application of the scope of the *Order* to include TEFLU's downstream, further

processed products; (2) Commerce's decision to collapse Maquilacero and TEFLU and treat

them as a single entity; (3) Commerce's use of period-wide averages to determine

Maquilacero/TEFLU's cost of manufacturing; (4) Commerce's decision to disregard

Maquilacero/TEFLU's normal books and records in favor of using a smoothing adjustment to

calculate Maquilacero/TEFLU's cost of production during the POR; and (5) Commerce's use of

its differential pricing analysis, including the Cohen's *d* test, to determine and apply the average-to-transaction methodology, with zeroing, to calculate Maquilacero/TEFLU's dumping margin.

For all the reasons mentioned above and brief fully in Maquilacero/TEFLU's accompanying Brief, Maquilacero/TEFLU respectfully move this Court to:

i.  Hold that Commerce's *Final Results* are not support by substantial evidence and otherwise not in accordance with law with respect to the claims advanced by Maquilacero/TEFLU in this action;

ii.  Remand the *Final Results* to Commerce for a determination consistent with the opinion of this Court; and

iii.  Grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

**/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia
John M. Gurley
Yun Gao
Tyler J. Kimberly
Christian L. Bush

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6291
Fax: (202) 857-6395
Email: diana.dimitriuc-quaia@afslaw.com

*Attorneys for Maquilacero S.A. de C.V. and*
*Tecnicas De Fluidos S.A. de C.V.*

Dated: December 17, 2025

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

MAQUILACERO S.A. DE C.V. AND
TECNICAS DE FLUIDOS S.A. DE C.V.,

*Plaintiffs*,

PRODUCTOS LAMINADOS DE
MONTERREY S.A. DE C.V.,

*Plaintiff-Intervenor*,

v.

THE UNITED STATES,

*Defendant*,

NUCOR TUBULAR PRODUCTS INC.,

*Defendant-Intervenor*.

**NON-CONFIDENTIAL VERSION**

**Court No. 1:25-cv-00176-JCG**

Confidential Business Proprietary
Information Deleted from Pages 7, 18, 28,
37, 41–44.

## PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD AND BRIEF IN SUPPORT FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Diana Dimitriuc Quaia
John M. Gurley
Yun Gao
Tyler J. Kimberly
Christian L. Bush

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6291
Fax: (202) 857-6395
Email: diana.dimitriuc-
quaia@afslaw.com

*Attorneys for Maquilacero S.A. de C.V.
and Tecnicas De Fluidos S.A. de C.V.*

December 17, 2025

AFSDOCS:304573682.1

# TABLE OF CONTENTS

I.    STATEMENT PURSUANT TO CIT RULE 56.2 ................................................ 2

    A.    Administrative Determination Under Review ........................................ 2

    B.    Issues Presented ..................................................................................... 2

        1.    Whether TEFLU's downstream products are within the
            scope of the *Order* ................................................................... 3

        2.    Whether Maquilacero and TEFLU comprise a single entity
            for purposes of this review ....................................................... 3

        3.    Whether Commerce explained its decision to use
            period-wide, weight-averaged costs to determine
            Maquilacero/TEFLU's COM .................................................... 4

        4.    Whether Commerce's reasonably and lawfully applied a
            smoothing adjustment. ............................................................... 4

II.   STATEMENT OF FACTS ............................................................................... 4

III.  STANDARD OF REVIEW ............................................................................. 12

IV.   SUMMARY OF ARGUMENT ....................................................................... 13

V.    ARGUMENT .................................................................................................. 15

    A.    Commerce's Scope Determination Is Not Supported by Substantial
        Evidence and Otherwise Not in Accordance with the Law ................. 15

        1.    Legal Framework .................................................................... 15

        2.    Information on the Record of This Review Shows That
            TEFLU's Products Are Distinct Downstream Products Not
            Covered by the Scope .............................................................. 17

        3.    The Court Should Reject Commerce's Scope Determination
            as Legally Deficient And Not Supported by the Record or
            the Law ..................................................................................... 19

            a.    Commerce's Scope Decision in This Review Is
                Deficient as a Matter of Law ....................................... 19

            b.    Commerce's Analysis of the (k)(1) Sources Was
                Unlawful, Inaccurate, And Must Be Remanded ........... 23

i

     i.  Commerce Did Not Explain Whether or How the Scope Is Ambiguous ............................................. 24

     ii.  Commerce Did Not Accurately Characterize the (k)(1) Sources ............................................... 27

  B.  Commerce's Decision to Collapse Maquilacero and TEFLU Is Not Supported by Substantial Evidence and Otherwise Not in Accordance with the Law ..................................................... 31

    1.  Legal Framework ..................................................... 31

    2.  Additional Background ........................................... 33

    3.  Commerce Failed to Address Evidence Showing that Maquilacero and TEFLU Do Not Produce Similar Merchandise or That One May Manipulate the Pricing or Production of the Other .................................... 34

  C.  Commerce's Use of Quarterly Averages to Calculate the COM is Not Supported by Substantial Evidence ................................ 36

  D.  Commerce's Use of a Smoothing Adjustment is Not Supported By Substantial Evidence and Otherwise Not in Accordance with the Law ...................................................................... 39

    1.  Legal Framework ..................................................... 39

    2.  Additional Background ........................................... 40

    3.  Commerce Failed to Reasonably Explain Why Maquilacero/TEFLU's Normal Books And Records Were Unreliable And Broke with Established Practice ....................................... 43

VI.  CONCLUSION ................................................................ 46

AFSDOCS:304573682.1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allied Tube & Conduit Corp. v. United States*,
　127 F.Supp.2d 207 (Ct. Int'l Trade 2000) ............................................................. 32

*Calgon Carbon Corp. v. United States*,
　487 F.Supp.3d 1359 (Ct. Int'l Trade 2020) ...................................................... 40, 45

*Cannon v. Watermark Ret. Cmtys., Inc.*,
　45 F.4th 137 (D.C. Cir. 2022) ........................................................................... 20

*Carpenter Tech. Corp. v. United States*,
　510 F.3d 1370 (Fed. Cir. 2007) ......................................................................... 34

*Changzhou Trina Solar Energy Co. v. United States*,
　352 F.Supp.3d 1316 (Ct. Int'l Trade 2018) ......................................................... 22

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
　701 F.3d 1367 (Fed. Cir. 2012) ......................................................................... 13

*Cox v. Dep't of Justice*,
　111 F.4th 198 (2d Cir. 2024) ............................................................................. 20

*DAK Ams. LLC v. United States*,
　456 F.Supp.3d 1340 (Ct. Int'l Trade 2020) ......................................................... 45

*Dellew Corp. v. United States*,
　855 F.3d 1375 (Fed. Cir. 2017) ......................................................................... 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
　591 U.S. 1 (2020) ............................................................................................. 22

*Document Sec. Sys., Inc. v. Nichia Corp.*,
　813 F. App'x 599 (Fed. Cir. 2020) ..................................................................... 20

*Dongkuk S&C Co. v. United States*,
　134 F.4th 1320 (Fed. Cir. 2025) ....................................................................... 39

*Dongkuk S&C Co. v. United States*,
　600 F.Supp.3d 1331 (Ct. Int'l Trade 2022), *aff'd*, 134 F.4th 1320 (Fed. Cir.
　2025) ............................................................................................................... 39

iii

*Duferco Steel, Inc. v. United States*,
    296 F.3d 1087 (Fed. Cir. 2002)...............................................................................15, 16, 24

*DuPont Teijin Films USA, LP v. United States*,
    407 F.3d 1211 (Fed. Cir. 2005)...............................................................................12

*Echjay Forgings Priv. Ltd. v. United States*,
    475 F.Supp.3d 1350 (Ct. Int'l Trade 2020) ...........................................................33, 34

*Fabuwood Cabinetry Corp. v. United States*,
    469 F.Supp.3d 1373 (Ct. Int'l Trade 2020) ...........................................................17

*Fedmet Res. Corp. v. United States*,
    755 F.3d 912 (Fed. Cir. 2014)...............................................................................15

*Gerald Metals, Inc. v. United States*,
    132 F.3d 716 (Fed. Cir. 1997)...............................................................................13

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*,
    413 F.Supp.3d 1347 (Ct. Int'l Trade 2019) ...........................................................44

*Hontex Enter. v. United States*,
    248 F.Supp.2d 1323 (Ct. Int'l Trade 2003) ...........................................................33, 35

*Katunich v. Donovan*,
    599 F.Supp. 985 (Ct. Int'l Trade 1984) .................................................................40

*King Supply Co. v. United States*,
    674 F.3d 1343 (Fed. Cir. 2012)...............................................................................15

*Maquilacero S.A. de C.V. v. United States*,
    731 F.Supp.3d 1346 (Ct. Int'l Trade 2024) ............................................... *passim*

*Marmen Inc. v. United States*,
    134 F.4th 1334 (Fed. Cir. 2025) .............................................................................3

*Mid Continent Nail Corp. v. United States*,
    846 F.3d 1364 (Fed. Cir. 2017)...............................................................................13

*Mid Continent Steel & Wire, Inc. v. United States*,
    551 F.Supp.3d 1360 (Ct. Int'l Trade 2021) ...........................................................45

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...............................................................................................36, 44

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)...............................................................................12

iv

*NLRB v. CNN Am., Inc.*,
    865 F.3d 740 (D.C. Cir. 2017) ..........................................................................40, 45

*NMB Sing. Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009)................................................22, 30, 44, 45

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995)................................................................13

*Officine Tecnosider SRL v. United States*,
    No. 23-00001, 2025 WL 2602551 (Ct. Int'l Trade Sept. 3, 2025) ...................................36, 37

*Pastificio Lucio Garofalo, S.p.A. v. United States*,
    783 F.Supp.2d 1230 (Ct. Int'l Trade 2011), *aff'd sub nom. Pastificio
    Garofalo, S.P.A. v. United States*, 469 F. App'x 901 (Fed. Cir. 2012)..................................36

*Prosperity Tieh Enters. v. United States*,
    965 F. 3d 1320 (Fed. Cir. 2020)................................................31, 35, 36

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011)................................................................22

*Ramaprakash v. F.A.A.*,
    346 F.3d 1121 (D.C. Cir. 2003) ..........................................................................40

*Rhone-Poulenc, Inc. v. United States*,
    927 F.Supp.451 (Ct. Int'l Trade 1996) ..........................................................................13

*Saha Thai Steel Pipe Pub. Co. v. United States*,
    101 F.4th 1310 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 1309 (2025)
    ......................................................................................................16, 25

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
    163 F.Supp.3d 1249 (Ct. Int'l Trade 2016) ..........................................................................12

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001)................................................................40, 45

*Solarworld Ams., Inc. v. United States*,
    182 F.Supp.3d 1372 (Ct. Int'l Trade 2016) ..........................................................................45

*Stein Indus. v. United States*,
    365 F.Supp.3d 1364 (Ct. Int'l Trade 2019) ................................................10, 30

*Stupp Corp. v. United States*,
    No. 2023-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) ..................................................3

v

*Tak Fat Trading Co. v. United States*,
    396 F.3d 1378 (Fed. Cir. 2005)...................................................................16

*Transactive Corp. v. United States*,
    91 F.3d 232 (D.C. Cir. 1996)....................................................................40

*U.S. Steel Corp. v. United States*,
    179 F.Supp.3d 1114 (Ct. Int'l Trade 2016) ..............................................32

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)...................................................................12, 13, 22

*Valeo N. Am., Inc. v. United States*,
    146 F.4th 1374 (Fed. Cir. 2025) ..............................................................15

*Viraj Grp. v. United States*,
    476 F.3d 1349 (Fed. Cir. 2007).................................................................32

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................12

19 U.S.C. § 1677b(f)(1)(A)...............................................................................39

**Regulations**

19 C.F.R. § 351.225(k)(1)............................................................................10, 15

19 C.F.R. § 351.225(k)(1)(i).............................................................................16

19 C.F.R. § 351.225(k)(1)(i)(D) ........................................................................29

19 C.F.R. § 351.401(f) ............................................................................ *passim*

19 C.F.R. § 351.401(f)(1) ...............................................................................9, 34

19 C.F.R. § 351.401(f)(2) ................................................................................32

19 C.F.R. § 351.401(f)(2)(i) and (ii) ................................................................35

**Administrative Determinations**

*Certain Cut-to-Length Carbon-Quality Steel Plate Products From the Republic of
    Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019*,
    85 Fed. Reg. 27362 (Dep't Commerce May 8, 2020), and accompanying
    Issues and Decision Memorandum ..................................................................40, 44

AFSDOCS:304573682.1

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 32720 (Dep't Commerce July 9, 2019), and accompanying Issues and Decision Memorandum .................................................................................................39, 44

*Certain Pasta From Italy: Notice of Final Results of 15th Antidumping Duty Administrative Review, Final No Shipment Determination and Revocation of Order, in Part; 2010-2011*, 78 Fed. Reg. 9364 (Dep't Commerce Feb. 8, 2013), and accompanying Issues and Decision Memorandum ...............................................38

*Common Alloy Aluminum Sheet From Italy: Final Affirmative Determination of Sales at Less Than Fair Value (LTFV)*, 86 Fed. Reg. 13309 (Dep't Commerce Mar. 8, 2021), and accompanying Issues and Decision Memorandum ...................................39

Final Results of Redetermination Pursuant to Court Remand, *Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V., et al v. United States*, Consol. Court No. 23-00091, Slip Op. 24-107 (CIT October 4, 2024), Light-Walled Rectangular Pipe and Tube from Mexico (Jan. 2, 2025) ............................................... *passim.*

Final Scope Ruling – Certain Tubing for Intermediate Bulk Container Cages (Feb. 9, 2021) ........................................................................................................................10

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 24473 (Dep't Commerce May 28, 2019), and accompanying Issues and Decision Memorandum ...............................................10, 30, 31

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 Fed. Reg. 10587 (Dep't Commerce Mar. 1, 2016), and accompanying Issues and Decision Memorandum ...........................10, 30

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 71829 (Dep't Commerce Oct. 18, 2023) ....................................................4

*Light-Walled Rectangular Pipe and Tube from Turkey*, Inv. No. 731-TA-1121, USITC Pub. 4001 (May 2008) (Final) .................................11, 28, 29

*Light-Walled Rectangular Pipe and Tube from China, Korea, Mexico, and Turkey*, Inv. Nos. 701-TA-449 and 731-TA-1118-1121 (Second Review), USITC Pub. 5086 (July 2020) (Final) ........................................................11, 29, 20

*Light-Walled Rectangular Pipe and Tube From Mexico: Amended Final Results and Partial Recission of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 38751 (Dep't Commerce Aug. 12, 2025).....................................................2

vii

*Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 16646 (Dep't Commerce Apr. 22, 2019), and accompanying Issues and Decision Memorandum ..........................................................................................................10

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 33646 (Dep't Commerce June 25, 2021), and accompanying Issues and Decision Memorandum ...................................................................................................4, 33, 35

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 15665 (Dep't Commerce Mar 14, 2023), and accompanying Issues and Decision Memorandum ............................................................................................................8

*Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 25232 (Dep't Commerce June 16, 2025), and accompanying Issues and Decision Memorandum ...................................................................................... *passim*

*Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of China, and the Republic of Korea: Antidumping Duty Orders; Light-Walled Rectangular Pipe and Tube from the Republic of Korea: Notice of Amended Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 45403 (Dep't Commerce Aug. 5, 2008) ...................................................... *passim*

*Light-Walled Rectangular Pipe and Tube from Mexico: Preliminary Results and Intent to Rescind, in Part, of Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 74916 (Dep't Commerce Sept. 13, 2024), and accompanying Preliminary Decision Memorandum ...............................................7, 8, 33, 37

*Low Melt Polyester Staple Fiber From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 14332 (Dep't Commerce Mar. 8, 2023), and accompanying Issues and Decision Memorandum ...................................................................................................39, 44

**Other Authorities**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296 (May 19, 1997)...............31, 35

United States International Trade Commission, *Harmonized Tariff Schedule of the United States* (2022 Revision 8) .............................................................................................27

AFSDOCS:304573682.1

**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V., <br><br> *Plaintiffs*, <br><br> PRODUCTOS LAMINADOS DE MONTERREY S.A. DE C.V., <br><br> *Plaintiff-Intervenor*, <br><br> v. <br><br> THE UNITED STATES, <br><br> *Defendant*, <br><br> NUCOR TUBULAR PRODUCTS INC., <br><br> *Defendant-Intervenor*. | <u>NON-CONFIDENTIAL VERSION</u> <br><br> **Court No. 1:25-cv-00176-JCG** <br><br> Confidential Business Proprietary Information Deleted from Pages 7, 18, 28, 37, 41–44. |

<u>**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Pursuant to Rule 56.2(c) of the Rules of the U.S. Court of International Trade ("CIT Rules"), and this Court's scheduling order, *see* Scheduling Order (Nov. 26, 2025), ECF No. 41, Plaintiffs Maquilacero S.A. de C.V. ("Maquilacero") and Tecnicas de Fluidos S.A. de C.V. ("TEFLU") (Maquilacero and TEFLU, collectively, "Maquilacero/TEFLU") hereby submit their Motion for Judgment on the Agency Record and Accompanying Brief. For the reasons set forth below, Maquilacero/TEFLU respectfully request that the Court reverse the challenged determination of the U.S. Department of Commerce ("Commerce") and remand with instructions for Commerce to reconsider: (1) its determination that downstream products produced by TEFLU from light-walled rectangular pipe and tube ("LWRPT") are within the scope of the underlying antidumping duty order; (2) its decision to collapse Maquilacero and TEFLU; (3) its

1

decision to use period-wide weight-averaged costs to determine Maquilacero/TEFLU's cost of manufacturing ("COM") during the period of review; (4) its decision to apply a smoothing adjustment in averaging costs to calculate Maquilacero/TEFLU's cost of production ("COP"); and (5) its use of the Cohen's *d* test as part of its differential pricing analysis.

## I.    STATEMENT PURSUANT TO CIT RULE 56.2

### A.    Administrative Determination Under Review

The administrative determination under review is *Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 25232 (Dep't Commerce June 16, 2025) ("*Final Results*") (P.R. 172), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 171), as amended by as amended by *Light-Walled Rectangular Pipe and Tube From Mexico: Amended Final Results and Partial Recission of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 38751 (Dep't Commerce Aug. 12, 2025) ("*Amended Final Results*") (P.R. 186); *see generally Light-Walled Rectangular Pipe and Tube from Mexico, the People's Republic of China, and the Republic of Korea: Antidumping Duty Orders; Light-Walled Rectangular Pipe and Tube from the Republic of Korea: Notice of Amended Final Determination of Sales at Less Than Fair Value*, 73 Fed. Reg. 45403 (Dep't Commerce Aug. 5, 2008) (the "*Order*").  The period of review ("POR") is August 1, 2022 through July 31, 2023.

### B.    Issues Presented

Maquilacero/TEFLU raise the following issues of fact and law in this brief:[1]

---

[1] To avoid any doubt, while Maquilacero/TEFLU is not arguing the Cohen's *d* issue in this brief, it is not waiving any challenges to Commerce's use of the Cohen's *d* test as part of its differential pricing analysis.  In response to the Court's August 22, 2025 letter inviting the parties' views on a potential remand in light of the U.S. Court of Appeals for the Federal Circuit's ("Federal Circuit") decisions in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025), and *Stupp*

AFSDOCS:304573682.1

1.      **Whether TEFLU's downstream products are within the scope of the** *Order*.

No.  Commerce effectively refused to decide the issue on this review's record, elevating its decision in a remand redetermination (which has not been approved by this Court) over this Court's instructions in *Maquilacero S.A. de C.V. v. United States*, ("*Maquilacero I*"), 731 F.Supp.3d 1346 (Ct. Int'l Trade 2024).  At no point has Commerce identified language in the *Order* which is ambiguous and would justify the inclusion of downstream products.  Instead, Commerce unlawfully and reasonably relied on the scope's silence with respect to downstream products to expand the reach of the *Order*.  *Id.* at 1356.

2.      **Whether Maquilacero and TEFLU comprise a single entity for purposes of this review.**

No.  Commerce's collapsing determination is contrary to law because the regulation that Commerce applied—19 C.F.R. § 351.401(f)—only applies when two companies have production facilities for similar or identical products that could be retooled without substantial cost.  Further, there is no significant potential for manipulation of price or production between Maquilacero and TEFLU and Commerce's finding to the contrary does not address evidence in the record detracting from its finding.

---

*Corp. v. United States*, No. 2023-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025), *see* Letter (Aug. 22, 2025), ECF No. 11, Maquilacero/TEFLU and Defendant proposed the following: that the Court remand the *Final Results* on the Cohen's *d* issue, but that it do so in a single, consolidated disposition addressing all of Maquilacero/TEFLU's claims to avoid multiple remands and promote efficiency.  *See* Joint Submission Concerning Scheduling (Sept. 5, 2025), ECF No. 14.  Therefore, Maquilacero/TEFLU maintain that Commerce's use of the Cohen's *d* test was not supported by substantial evidence and not in accordance with law. Maquilacero/TEFLU intend to brief this issue further following a remand by this Court.

AFSDOCS:304573682.1

      **3.**      **Whether Commerce explained its decision to use period-wide, weight-averaged costs to determine Maquilacero/TEFLU's COM.**

No. Commerce unreasonably abandoned its preliminary application of the quarterly cost methodology and instead used POR-wide averages to calculate the COM although the underlying facts did not change. Commerce should find that use of the quarterly cost methodology is warranted to avoid distorting the COM.

      **4.**      **Whether Commerce's reasonably and lawfully applied a smoothing adjustment.**

No. Commerce's reasoning is contradictory. More problematic—Commerce never explains the statutory or regulator basis for disregarding a respondent's audited financial statements or how its use of a smoothing adjustment comports with its decisions in prior reviews. In past reviews, Commerce established a practice of accepting Maquilacero/TEFLU's books and records to determine the COP and the record shows no changes in M Maquilacero/TEFLU's data systems for tracking costs or in its cost methodologies. The so-called smoothing adjustment is nothing short of arbitrary.

## II.    <u>STATEMENT OF FACTS</u>

On October 18, 2023, Commerce initiated the antidumping administrative review covering entries from August 1, 2022 through July 31, 2023. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 71829, 71831 (Dep't Commerce Oct. 18, 2023) (P.R. 15). On November 8, 2023, Commerce selected the mandatory respondents in this review: Maquilacero/TEFLU and Perfiles LM, S.A. de C.V. *See* Respondent Selection (Nov. 8, 2023) (C.R. 3, P.R. 23). Commerce collapsed Maquilacero and TEFLU into a single entity based on its decision from a previous administrative review. *See id*. at 1 n.1 (citing *Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative*

AFSDOCS:304573682.1

*Review; 2018-2019*, 86 Fed. Reg. 33646 (Dep't Commerce June 25, 2021) ("*AR18–19 Final Results*"), and accompanying Issues and Decision Mem. at 25–31 (June 21, 2021) ("AR18–19 IDM").

Maquilacero and TEFLU timely responded to Commerce's initial antidumping questionnaires.  In its Section A Questionnaire response, Maquilacero indicated that it manufactures and sells commercial LWRPT to customers in Mexico and the United States. Maquilacero S.A. de C.V.'s Section A Questionnaire Response at 5, 9 (Dec. 22, 2023) ("Maquilacero AQR") (P.R. 48, C.R. 12).  Maquilacero explained that "TEFLU is a component manufacturer for the automotive industry," which "does not produce LWRPT or any other pipe and tubes and has no pipe mills whatsoever."  *Id.* at 14. "TEFLU does not sell LWRPT, but sells only parts that are further processed from LWRPT" to original equipment manufacturers (or "OEMs").  *Id.* at 14–16, Exh. A-29 (P.R. 48, 52, C.R. 12, 28-29); Maquilacero S.A. de C.V.'s Section B Downstream Sales Questionnaire Response for Tecnicas De Fluidos S.A. de C.V. at 5– 6 (Jan. 17, 2024) ("TEFLU BQR") (P.R. 71, C.R. 35).  Instead, TEFLU processes the LWRPT into downstream products.  Specifically, TEFLU manufactures customized automotive parts in its own facilities, using distinct production equipment and machinery (compared to Maquilacero), which creates a new product with a single end-use in automotive subassembly. *See* Maquilacero AQR, Exh. A-6, (P.R. 48, C.R. 12); TEFLU BQR at 5 (P.R. 72, C.R. 35). Conversely, Maquilacero manufactures commodity products (LWRPT), which are sold in bulk for various purposes.  *See* Maquilacero AQR at 46, Exhs. A-26, A-27 (P.R. 48, 52, C.R. 12, 27, 28).  TEFLU's products are not at all interchangeable with the products that Maquilacero produces.

AFSDOCS:304573682.1

Maquilacero/TEFLU maintained throughout the review that the parts produced by TEFLU from LWRPT are new downstream products distinct from the input LWRPT, and are not covered by the scope of the *Order*. *See, e.g.*, TEFLU BQR at 7 (P.R. 72, C.R. 35); Maquilacero AQR at 14 (P.R. 48, C.R. 12). However, to comply with Commerce's instructions, TEFLU timely submitted a questionnaire response containing its downstream sales of parts produced using finished LWRPT purchased from Maquilacero and other suppliers. *See generally* TEFLU BQR (P.R. 71, C.R. 35); Maquilacero S.A. de C.V.'s Section C Downstream Sales Questionnaire Response for Tecnicas De Fluidos S.A. de C.V. (Jan. 17, 2024) ("TEFLU CQR") (P.R. 72, C.R. 38).[2]

Consistent with Commerce's practice in prior reviews of the *Order*, it requested sales and cost information on a CONNUM-specific basis which accounted for six characteristics: (1) Steel Input Type; (2) Metallic Coating; (3) Painted; (4) Nominal Perimeter; (5) Nominal Wall Thickness; and (6) Shape. *See, e.g.*, Maquilacero S.A. de C.V.'s Section B Questionnaire Response at 17–21 (Jan. 17, 2024) ("Maquilacero BQR") (P.R. 70, C.R. 32); Maquilacero S.A. de C.V.'s Section C Questionnaire Response at 14–18 (Jan. 17, 2024) ("Maquilacero CQR"), (P.R. 73, C.R. 41).

In the Sections B and C questionnaire responses, Maquilacero/TEFLU reported a new variable (FURPROCESSH/U) to distinguish downstream products from standard LWRPT and requested that Commerce include this variable in the CONNUM to account for the significant

---

[2] Another affiliated party, Abinsa S.A. de C.V., a reseller and steel service center, purchased LWRPT from Maquilacero for resale to its own customers, and also provided its downstream sales information to Commerce. *See* Maquilacero S.A. de C.V.'s Section B Downstream Sales Questionnaire Response for Abinsa S.A. de C.V. (Jan. 19, 2024) (P.R. 75, C.R. 53).

differences in the products made by TEFLU.  *See* TEFLU BQR at 5, 14–15 & Exh. BA2-2 (P.R.

71, C.R. 35); TEFLU CQR at 9 (P.R. 72, C.R. 38); Maquilacero BQR, Exh. B-2 (P.R. 70, C.R.

32); Maquilacero CQR, Exh. C-2 (P.R. 73, C.R. 41).  Maquilacero/TEFLU also included a

second control number in the sales databases (CONNUM2H/U) to distinguish the downstream

products.  *See* TEFLU BQR at 14–15 & Exh. BA2-2 (P.R. 71, C.R. 35); TEFLU CQR at 8–9

(P.R. 72, C.R. 38); Maquilacero BQR at 12–13 (P.R. 70, C.R. 32); Maquilacero CQR at 9–10

(P.R. 73, C.R. 41).

On July 9, 2024, Commerce issued a supplemental questionnaire, *see* Supplemental

Questionnaire (July 9, 2024) (P.R. 91, C.R. 70), instructing Maquilacero/TEFLU to "{p}rovide a

narrative explanation, supported by documentation, of the differences in total cost of

manufacture (TOTCOM) for the [          ] . . . and the [          ]," specific to certain

CONNUMs.  *Id.* at 8.  In response, Maquilacero/TEFLU explained that "the difference in the

reported TOTCOM values primarily stems from coil costs incurred for each CONNUM."

Maquilacero S.A. de C.V.'s First Supplemental Sections A–D Questionnaire Response at 14-15

(Aug. 13, 2024) ("1SQR") (P.R. 108, C.R. 81).  Maquilacero/TEFLU also provided a summary

of reported costs for the relevant CONNUM-quarter combinations and explained that that

summary "indicates that the primary difference among the average coil costs is whether the coil

was [          ]."  *See id.* at 15 & Exh. S-30(B) (P.R. 108, C.R. 81, 93).

On September 9, 2024, Commerce issues the preliminary results.  *See Light-Walled*

*Rectangular Pipe and Tube from Mexico: Preliminary Results and Intent to Rescind, in Part, of*

*Antidumping Duty Administrative Review; 2022–2023*, 89 Fed. Reg. 74916 (Dep't Commerce

Sept. 13, 2024) ("*Preliminary Results*") (P.R. 120), and accompanying Prelim. Decision Mem.

("PDM") (P.R. 115).  Relevant to this appeal, Commerce made the following decisions for the

*Preliminary Results*: (1) TEFLU's downstream products are in-scope; (2) Maquilacero and TEFLU comprise a single entity; (3) Maquilacero/TEFLU's COM exhibited significant changes over the POR, warranting the use of quarterly costs averages to determine the COM; and (4) the results of the differential pricing analysis, including the use of Cohen's *d*, justified the use of the average-to-transaction methodology to calculate Maquilacero/TEFLU's weighted-average margin. *See* PDM at 1–3, 8–9, 14–15 (P.R. 115).

While this review was ongoing, Maquilacero/TEFLU appealed Commerce's final results of the administrative review covering the period 2020 to 2021. *See Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 15665 (Dep't Commerce Mar 14, 2023) ("*AR20–21 Final Results*"), and accompanying Issues and Decision Mem. ("AR20–21 IDM"). In that appeal, Maquilacero/TEFLU challenged Commerce's determination that TEFLU's downstream products are within the scope of the *Order* and Commerce's decision to collapse Maquilacero and TEFLU. *See generally Maquilacero I*, 731 F.Supp.3d 1346.

On October 4, 2024, this Court remanded Commerce's scope determination. *See generally Maquilacero I*, 731 F.Supp.3d at 1349–64. On remand, the Court tasked Commerce with answering the following question: "whether TEFLU's further manufactured products, which are {LWRPT} that underwent a process of saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further processing, were downstream products outside of the scope." *Id.* at 1365. The Court ordered Commerce to conduct three inquiries in response to its opinion:

1. Address whether TEFLU's further processed products are within an industry that was investigated by the U.S. International Trade Commission ("ITC")

AFSDOCS:304573682.1

when the ITC determined that certain pipe and tube caused material injury or threat of material injury to domestic producers

2.  Determine the degree to which TEFLU's products were processed by saw-cutting, laser cutting-to-length, drilling, perforation, bending, or other further manufacturing processes, and whether each product was further processed so as to no longer fall within the scope; and

3.  Address whether TEFLU's further processed products are realistically interchangeable with the pipe and tube covered under the scope.

*See id.* at 1358–60 (cleaned up and re-formatted). Because the Court remanded Commerce's scope determination, it explained that "TEFLU's further processed products may not be within the scope of the *Order* as downstream products," which would cause Commerce to reconsider "whether the products produced by Maquilacero and TEFLU are similar or identical under 19 C.F.R. § 351.401(f)(1)." *Id.* at 1364. In short, if TEFLU's products are not within the scope, that is an independent basis for not collapsing Maquilacero and TEFLU.

On January 2, 2025, Commerce issued the remand redetermination in the appeal of the *AR20–21 Final Results* and continued to find TEFLU's downstream products within the scope of the *Order*. *See* Final Results of Redetermination Pursuant to Court Remand, *Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V., et al v. United States*, Consol. Court No. 23-00091, Slip Op. 24-107 (CIT October 4, 2024), Light-Walled Rectangular Pipe and Tube from Mexico (Jan. 2, 2025) ("*Remand*").[3] Commerce noted that "the plain language of the scope does not address further processed LWRPT." *Remand* at 6. As this Court found, nothing in the scope suggests "that downstream products or automotive parts should be included in-scope." *Id.* With

---

[3] Commerce did not place the *Remand* on this review's record, and it is not part of the record before this Court. As discussed *infra* <u>Sections V.A.3</u>, Maquilacero/TEFLU object to the manner in which Commerce relies on the *Remand* to justify its scope determination and its failure to engage with the record of this review.

no further analysis of the scope's plain language, Commerce concluded that "the plain language of the scope {was} ambiguous with respect to TEFLU's specific products as it includes no language concerning further processing or downstream products." *Id*. Commerce asserted that it was "no longer relying on the scope language's silence and in considering the scope's ambiguity." *Id*.

Commerce found that the following sources in 19 C.F.R. § 351.225(k)(1) supported including TEFLU's downstream products within the scope: **(1)** Commerce's scope determination in *Certain Tubing for Intermediate Bulk Container Cages*—a separate scope ruling, *see* Final Scope Ruling – Certain Tubing for Intermediate Bulk Container Cages (Feb. 9, 2021) ("*IBC Cages*"); **(2)** Commerce's redetermination pursuant to the remand ordered by the CIT in *Stein Indus. v. United States*, 365 F.Supp.3d 1364, 1373 (Ct. Int'l Trade 2019); **(3)** Commerce's decision that Maquilacero's further processed products were within the scope of the *Order* in the administrative review covered the period 2016 to 2017, *see Light-Walled Rectangular Pipe and Tube From Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 16646 (Dep't Commerce Apr. 22, 2019), and accompanying Issues and Decision Mem. ("AR16–17 IDM"); **(4)** Commerce's findings that further processed and custom-designed heavy walled rectangular pipes and tubes ("HWRPT") are within the scope of that antidumping duty order in *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 Fed. Reg. 10587 (Dep't Commerce Mar. 1, 2016), and accompanying Prelim. Decision Mem. ("HWRPT Inv. PDM"), and *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 24473 (Dep't Commerce May 28,

10

2019), and accompanying Issues and Decision Mem. ("HWRPT AR1 IDM"); **(5)** the ITC's purported finding that the domestic industry affected by the LWRPT investigations includes further processed LWRPT subject to severe fabrication in *Light-Walled Rectangular Pipe and Tube from Turkey*, Inv. No. 731-TA-1121, USITC Pub. 4001, at I-12 (May 2008) (Final) ("*ITC Report –LWRPT from Turkey*"); and **(6)** the ITC's consideration of LWRPT that is cut, bent, drilled, and perforated in *Light-Walled Rectangular Pipe and Tube from China, Korea, Mexico, and Turkey*, Inv. Nos. 701-TA-449 and 731-TA-1118-1121 (Second Review), USITC Pub. 5086 (July 2020) (Final) ("*ITC Report – LWRPT from Mexico Second Review*"). *See Remand* at 30–31; IDM at 8-9 and n.45 (P.R. 171).[4]

Between March 6 and 17, 2025, interested parties filed case briefs and rebuttal briefs. Relevant here, Maquilacero/TEFLU challenged: (1) Commerce's continued inclusion of TEFLU's downstream products within the scope of the *Order*, despite this Court's opinion in *Maquilacero I*; and (2) Commerce's decision to collapse Maquilacero and TEFLU. *See* Maquilacero S.A. de C.V.'s Case Brief at 7–21, 28–34 (Mar. 5, 2025) ("Maquilacero/TEFLU Case Br.") (P.R. 157, C.R. 141). Petitioner urged Commerce to reconsider its use of quarterly cost averages for Maquilacero/TEFLU's COM and to use a smoothing adjustment when calculating Maquilacero/TEFLU's costs. *See* Nucor Tubular's Case Brief (Mar. 5, 2025) ("Petitioner Case Br.") (P.R. 158, C.R. 142). Maquilacero/TEFLU filed a brief countering Petitioner's arguments. *See* Maquilacero S.A. de C.V.'s Rebuttal Brief (Mar. 14, 2025) ("Maquilacero/TEFLU Rebuttal Br.") (P.R. 162, C.R. 148).

---

[4] On June 17, 2025, this Court remanded for Commerce to consider the impact of *Marmen* and *Stupp* on its decision. *See Maquilacero S.A. de C.V., et al. v. United States, et al.*, CIT Case No. 1:23-cv-00091-JCG, Order (June 17, 2025), ECF No. 78.

AFSDOCS:304573682.1

On June 10, 2025, Commerce issued the *Final Results*. Commerce continued to find that TEFLU's further-processed, downstream products are within the scope of *Order*. IDM at 8–10 (P.R. 171). Commerce also continued to collapse Maquilacero and TEFLU into a single entity and declined to revisit that conclusion absent evidence of changed circumstances. *Id.* at 10–12. Commerce granted Petitioner's request to use POR-wide average costs after finding that the 25% volatility threshold was not met for a majority of the tested CONNUMs. *Id.* at 13–16. Finally, Commerce applied a smoothing adjustment to material costs because, in Commerce's view, Maquilacero/TEFLU's normal books and records did not reasonably reflect production costs. *Id.* at 16–18.

## III.    STANDARD OF REVIEW

This Court must remand any determination by Commerce which is "unsupported by substantial evidence on the record" as a whole or is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (citation omitted). The Court must ensure that Commerce has relied on more than a mere "scintilla" of evidence, *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), and has not reached a conclusion that is against the "clear weight" of the record evidence, *Shandong Rongxin Imp. & Exp. Co. v. United States*, 163 F.Supp.3d 1249, 1252 (Ct. Int'l Trade 2016) (citation omitted). Commerce must address evidence that detracts from its determination—not just the

12

evidence that it cites as supporting its conclusion. *Universal Camera*, 340 U.S. at 488; *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).

In addition to following the statute and its regulations, Commerce has a duty to both exercise its discretion in a manner that is reasonable and to avoid arbitrary action. If Commerce abuses its discretion or its decision is arbitrary or capricious, then its determination is not in accordance with law. *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ("Commerce's decision will {also} be set aside if it is arbitrary and capricious." (alteration in original) (quoting *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012)); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1207–08 (Fed. Cir. 1995) (remanding where Commerce's refusal to accept corrective information constituted an abuse of discretion). Additionally, this Court has found Commerce's determinations unlawful "where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. v. United States*, 927 F.Supp.451, 454 (Ct. Int'l Trade 1996).

## IV.    SUMMARY OF ARGUMENT

This case involves Maquilacero, a Mexican producer of LWRPT, and its affiliate TEFLU, which performs downstream processing of LWRPT and produces customized parts for the automotive industry. Put simply, Maquilacero and TEFLU do not make the same products. Commerce came to the opposite conclusion in the *Remand*. And in relying entirely on the *Remand* to justify its scope determination in the *Final Results*, Commerce unlawfully elevated its decision in the *Remand* over this Court's instructions in *Maquilacero I*. Exacerbating its error, Commerce did not put the (k)(1) sources on the record of this review or address evidence or arguments contrary to its scope determination, which are on the record of this review.

13

Commerce also failed to identify any ambiguities in the scope that could be interpreted to include TEFLU's downstream products.  Finally, Commerce's characterizations of the (k)(1) sources in the *Final Results* are inaccurate.  Commerce characterized the (k)(1) sources such that TEFLU's downstream products are covered by the scope, but a fair and honest reading of the (k)(1) sources shows that the ITC and Commerce have never actually considered downstream or automotive products within the scope.

Next, Commerce's decision to collapse Maquilacero and TEFLU is contrary to law and unsupported.  Collapsing requires production facilities for similar or identical products that can be retooled without substantial overhaul and a demonstrated, significant potential for manipulation.  The record shows that Maquilacero manufactures LWRPT, while TEFLU cannot. Commerce neither analyzed whether either facility could be retooled without substantial cost nor substantiated its finding of "significant manipulation potential" under the totality of the circumstances.

Similarly, Commerce's decision to abandon the quarterly cost averaging methodology is unreasonable.  The record shows pronounced quarterly cost changes for high-volume CONNUMs and a strong cost–price linkage. Commerce failed to respond to Maquilacero/TEFLU's argument on how to evaluate a 50/50 split—Commerce should decide to use the quarterly cost methodology if doing so would minimize distortions in the cost data. Commerce's approach should be remanded for a reasoned explanation.

Finally, Commerce's smoothing adjustment is arbitrary and unsupported.  By statute, Commerce must rely on GAAP-consistent books that reasonably reflect costs and may adjust only to address true distortions, considering all evidence and reconciling its approach with precedent.  For all prior reviews, Commerce accepted Maquilacero/TEFLU's books and did not

14

require coil-type costs in the CONNUM. Here, Commerce deemed "some" cost differences

sufficient to reject those records while simultaneously acknowledging that "some" unusual

differences do not justify departure. Commerce did not come to grips with its past practice or

provide a reasoned basis for disparate treatment. Commerce's use of a smoothing adjustment in

the *Final Results* should be remanded.

## V.    ARGUMENT

### A.    Commerce's Scope Determination Is Not Supported by Substantial Evidence and Otherwise Not in Accordance with the Law

#### 1.    Legal Framework

The "plain language of a countervailing or antidumping order is 'paramount' in

determining whether particular products are included within its scope." *Fedmet Res. Corp. v.*

*United States*, 755 F.3d 912, 918 (Fed. Cir. 2014), citing *King Supply Co. v. United States*, 674

F.3d 1343, 1345 (Fed. Cir. 2012). Commerce must consider the plain language of the scope and

determine whether it is ambiguous. *See Valeo N. Am., Inc. v. United States*, 146 F.4th 1374,

1377 (Fed. Cir. 2025). "This step is sometimes referred to as the '(k)(0)' inquiry." *Id.* (citation

omitted); *see also* 19 C.F.R. § 351.225(k)(1). "Scope orders may be interpreted as including

subject merchandise *only if* they contain language that specifically includes the subject

merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc. v. United States*,

296 F.3d 1087, 1089 (Fed. Cir. 2002) (emphasis added). As this Court reminded Commerce,

"{i}t is well-established that subject merchandise may be included in-scope only if the scope

language specifically includes the merchandise or may be reasonably interpreted to include it."

*Maquilacero I*, 731 F.Supp.3d at 1355–56. Commerce cannot interpret the silence of an order—

when the scope does not mention whether a downstream product is covered or excluded—to

15

include any downstream product. *See id.* at 1356. In short, Commerce cannot rely on the silence of the scope of the *Order* to find that products are in-scope. *Id.*

If Commerce finds that the scope is ambiguous, it may examine the (k)(1) sources to construe the scope and determine whether the product(s) at issue are covered by the order. *See, e.g.*, *Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1324 (Fed. Cir. 2024), *cert. denied*, 145 S. Ct. 1309 (2025). When construing the scope of an order, Commerce may interpret, but not enlarge, the scope of the order as determined in the original investigations. *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). The (k)(1) sources are defined as:

> (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue;
>
> (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;
>
> (C) Previous or concurrent determinations of {Commerce}, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and
>
> (D) Determinations of the {ITC} pertaining to the order at issue, including reports issued pursuant to the {ITC's} initial investigation.

19 C.F.R. §351.225(k)(1)(i). "While these materials do not substitute for the scope language, they reflect the historical context and may provide 'valuable guidance' for the interpretation of the order." *Saha Thai*, 101 F.4th at 1325 (quoting *Duferco Steel*, 296 F.3d at 1097).

The latitude afforded to Commerce in making scope determinations is not unlimited, and Commerce may not change the original scope of its orders through the interpretive process. *See Tak Fat*, 396 F.3d at 1382–83. "{P}roducts included in the scope of an order must be covered by the underlying investigations; the scope cannot extend to a ***distinct, downstream product*** that

16

was not a part of the underlying investigation." *Fabuwood Cabinetry Corp. v. United States*, 469

F.Supp.3d 1373, 1389 (Ct. Int'l Trade 2020) (emphasis added).

> **2.    Information on the Record of This Review Shows That TEFLU's Products Are Distinct Downstream Products Not Covered by the Scope**

The scope of the *Order* provides, in relevant part:

> The merchandise subject to these orders is certain welded carbon quality light–walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm.
>
> . . . .
>
> The welded carbon-quality rectangular pipe and tube subject to these orders is currently classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.61.50.00 and 7306.61.70.60. While HTSUS subheadings are provided for convenience and Customs purposes, our written description of the scope of these orders is dispositive.

*Order*, 73 Fed. Reg. at 45404.  As discussed above, Commerce relied entirely on its reasoning in

the *Remand* to issue the scope decision for the *Final Results*.  *See* IDM at 8–10 (P.R. 171).

Repeating its analysis of the (k)(1) sources, Commerce concluded that TEFLU's further

processed, customized products were in-scope.  *See id*.

Maquilacero/TEFLU placed evidence on the record that overwhelming demonstrates that

TEFLU's further manufactured products are distinct from and downstream of LWRPT and

cannot be reasonably considered within the scope of the *Order*.  For example,

Maquilacero/TEFLU pointed out that TEFLU transforms LWRPT "into a different product by

further processing, including saw-cutting, laser cutting-to-length, drilling, perforation and/or

bending."  Maquilacero/TEFLU Case Br. at 8 (P.R. 157, C.R. 141) (citing Maquilacero AQR at

16, 21, 32-34, and Exhs. A-6, A-8D, A-8G, A-15, A-28, and A-29 (P.R. 48, 52, C.R. 12-13, 19-

22, 28-29)); *see also* TEFLU BQR at 5–6 (P.R. 71, C.R. 35).  Parts sold by TEFLU are

customized for a specific customer and a specific customer's automotive and machinery

subassembly, such as [

                                            ]. *See* Maquilacero AQR, Exhs. A-6, A-8D, and A-8G

(P.R. 48, C.R. 12–14).  TEFLU's products are not interchangeable with each other.  For example,

the [                ] that TEFLU makes for [        ] cannot be substituted for [

            ] for [                ], or vice versa.  *See id.*, Exh. A-6 (P.R. 71, C.R. 12).  These

products are customized to meet each "customer's drawing and can comply with the very tight

tolerances in the OEM market, as dictated by the Production Part Approval Process."

Maquilacero/TEFLU Case Br. at 8 (P.R. 157, C.R. 141).  U.S. Customs and Border Protection

("CBP") has ruled that the type of processing TEFLU performs substantially transforms the

LWRPT into a different class or kind of product that is not classifiable under HTSUS

subheadings 7306.61.50.00 and 7306.61.70.60—the HTSUS headings set out in the *Order*.  *See*

TEFLU BQR at 7 (P.R. 71, C.R. 35) (citing CBP, HQ H213699 (July 26, 2013) ("HQ

H213699"); CBP, HQ 560667 (Feb. 20, 1998) ("HQ 560667")).

          LWRPT, on the other hand, is a commodity product, "produced and sold pursuant to

general steel industry standards (ASTM A-513 and ASTM A-500)."  Maquilacero AQR at 22,

Exh. A-24 (P.R. 48-51, C.R. 12, 25-27).  There is no customization in the LWRPT production

process because it is sold "based on standard sizes, length and weight."  Maquilacero/TEFLU

Case Br. at 9 (P.R. 157, C.R. 141).

          Citing this evidence, Maquilacero/TEFLU argued the TEFLU's downstream products are

not covered by the scope language.  *See id.* at 8–10 (arguing that "Custom-Designed Parts Sold

by TEFLU Do Not Meet the Scope Language").  Rather, "the products sold by TEFLU are auto

parts such as [                                            ], not LWRPT."  *Id.* at 9–10 (citing, *inter*

*alia*, Maquilacero AQR, Exhs. A-6**,** A-8D, A-8G and A-15 (P.R. 71, C.R. 12-14)).

Maquilacero/TEFLU pointed to this Court's opinion in *Maquilacero I*, the authorities the Court cited in that opinion, physical differences between LWPRT and TEFLU's downstream products, disparate end-uses of the products, the lack of interchangeability, and other information on the record establishing that TEFLU does not make products covered by the *Order*. *See* Maquilacero/TEFLU Case Br. at 10–15 (P.R. 157, C.R. 141).

Commerce refused to engage with these arguments or analyze this evidence. Instead, Commerce insisted that it resolved the scope issue in the *Remand* by interpreting the (k)(1) sources and concluded that TEFLU's products were in scope. *See* IDM at 8–10 (P.R. 171). Commerce quoted two paragraphs from the *Remand* in which Commerce discussed several (k)(1) sources. *See id.* at 9 (quoting *Remand* at 30–31).

At the same time, Commerce downplayed its obligation to follow the Court's order in *Maquilacero I*. Commerce implied that this Court's decision in *Maquilacero I* is not controlling because the "case is ongoing and on remand, and, thus, . . . not final and conclusive and remains subject to appeal at the Federal Circuit." IDM at 10 (P.R. 171). Yet a few sentences before, Commerce clung to the *Remand* as if it were authoritative precedent. *See id.* at 9. Commerce concluded that the record of this review did not detract "from Commerce's determination or indicate{} that TEFLU's further processed LWRPT is outside of the scope." *Id.* at 10.

### 3. The Court Should Reject Commerce's Scope Determination as Legally Deficient And Not Supported by the Record or the Law

#### a. Commerce's Scope Decision in This Review Is Deficient as a Matter of Law

By relying exclusively on two paragraphs from the *Remand* Commerce effectively failed to issue a decision on the record of this review. The Court should reject Commerce's scope determination on that basis alone. Specifically: (1) Commerce erroneously elevated its *Remand*

decision over this Court's opinion in *Maquilacero I*; (2) Commerce failed to issue a decision that engages with the evidence and arguments on the record of this review; and (3) Commerce did not place any of the (k)(1) sources it cited (in the quote from the *Remand*) on the record of this review, such that the Court cannot gauge their accuracy.

First, Commerce treated its decision in the *Remand* as precedential while eschewing its obligation to address the issues identified by the Court in *Maquilacero I*. Commerce seemed to presume that a holding by this Court does not have binding or precedential effect until Commerce has had the final word in the particular proceeding from which that holding arose. Commerce has it backwards. *See, e.g.*, *Cannon v. Watermark Ret. Cmtys., Inc.*, 45 F.4th 137, 149 (D.C. Cir. 2022) ("Built into our federal judicial system is the notion that binding precedent 'for the district courts within a circuit' is set 'only by the court of appeals for that circuit.'" (citation omitted)); *Dellew Corp. v. United States*, 855 F.3d 1375, 1382 (Fed. Cir. 2017) ("We reaffirm a well-known principle that the Court of Federal Claims failed to follow here: the Court of Federal Claims must follow relevant decisions of the Supreme Court and the Federal Circuit, not the other way around."). Commerce's understanding of judicial authority would reserve to Commerce, not the courts, the ultimate authority to rule on the lawfulness of Commerce's decisions. A precedential opinion, like *Maquilacero I*, becomes binding on the agencies under the Court's jurisdiction "when it is decided," regardless of whether the opinion is accompanied by a mandate or whether the decision is appealed. *Cf. Cox v. Dep't of Justice*, 111 F.4th 198, 209 (2d Cir. 2024); *Document Sec. Sys., Inc. v. Nichia Corp.*, 813 F. App'x 599, 600 (Fed. Cir. 2020).

In *Maquilacero I*, the Court explained that Commerce's scope determination is unlawful unless Commerce: (i) addresses whether TEFLU's further-processed products fall within the industry the ITC investigated in the original investigation; (ii) determines the extent of TEFLU's

20

processing and whether each product was processed beyond the scope; and (iii) addresses

whether TEFLU's further-processed products are realistically interchangeable with in-scope

LWRPT.  Therefore, in any case presenting similar facts as *Maquilacero I*—such as this

review—Commerce's reasoning must address those three points.  The quote Commerce lifted

from the *Remand* touches on (but does not satisfy) the Court's concerns.

Concerning point (i), Commerce strained the ITC's analysis to (incorrectly) give the

impression that the ITC investigated the automotive industry in the original investigation.[5]  On

point (ii), the *Remand* quote does not meaningfully address the impact of TEFLU's further

processing because it does not address the evidence in this review.  The *Remand* quote vaguely

discusses Commerce's interpretation of the (k)(1) sources.  To the extent the quote addresses

interchangeability—point (iii)—it does so in vague and general terms, which do not respond to

the Court's concern that TEFLU's products are not "realistically interchangeable with the raw

input of" LWRPT.  *Compare* IDM at 9 (P.R. 171) ("Additionally, the ITC noted that LWPRT may

not be readily interchangeable from different sources while still being considered LWPRT"), *with*

*Maquilacero I*, 371 F.Supp.3d at 1360 ("Commerce must examine TEFLU's further processed

products to determine whether . . . TEFLU's further processed products were realistically

interchangeable with the raw input of {LWRPT} of rectangular cross section having a wall

thickness of less than 4 mm.").  Commerce's failure to adhere to *Maquilacero I* necessitates a

remand.

Second, the *Remand* does not excuse Commerce from addressing evidence and argument

detracting from its scope determination on this record.  References to analyses of facts in a

---

[5] For additional explanation of Commerce's incorrect interpretation of the ITC's analysis, *see infra* <u>Section V.A.3.b.ii.</u>

separate review do not automatically dictate the outcome in this review.  *See, e.g.*, *QVD Food Co. v. United States*, 658 F.3d 1318, 1324–25 (Fed. Cir. 2011) (explaining that review of an administrative review "is normally limited to the record before the agency in the particular review proceeding at issue and does not extend to subsequent proceedings").[6]  Commerce cannot shirk its responsibility to issue a decision that is supported by substantial evidence and in accordance with the law by simply quoting part of finding from another segment.

To that point, Commerce failed to address evidence and arguments on the record of this review.  It is well-settled that courts must remand agency decisions where the agency failed to consider an important aspect of the issues before it and/or to address evidence fairly detracting from its conclusions.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–31 (2020); *Universal Camera*, 340 U.S. at 477.  As discussed *supra* <u>Section V.A.2</u>, Maquilacero/TEFLU created a robust record demonstrating that TEFLU's further processed products are outside of the scope.  Maquilacero/TEFLU also advanced detailed and credible arguments based on that record.  The *Remand* quote did not respond to those arguments or

---

[6] This principle is distinct from Commerce's obligation to observe or explain its departure from an established practice or policy.  *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) (remanding to Commerce and explaining that "{o}nce Commerce establishes a course of action . . . Commerce is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary"); *see also infra* <u>Section V.D.3</u> (describing Commerce's obligation to follow its established practice or provide a justification for departing from the practice).  But even when Commerce follows a practice or policy, it must analyze the record before it and explain why that record warrants application of its practice.  *See Changzhou Trina Solar Energy Co. v. United States*, 352 F.Supp.3d 1316, 1342 (Ct. Int'l Trade 2018) (observing Commerce's obligation to explain "why a decision made in an earlier review should control").  Here, the *Remand* does not amount to a practice or policy—it is a single decision, which has been remanded and lacks Court approval—and even if it were, Commerce did not "connect the dots" or engage in an analysis of the information on the record.  *Id.*

AFSDOCS:304573682.1

explain the impact of the evidence in this review.  Commerce's failure to engage with this evidence and these arguments requires a remand.

Third, the Court should decline to consider the substance of Commerce's quote from the *Remand* because the sources discussed in the quote are not on the record of this review.  In *Maquilacero I*, this Court was clear: (k)(1) sources may be considered **only if** they are "on the record filed with the Court."  731 F.Supp.3d at 1363.  None of the sources cited in the *Remand* quote are on the record of this review.  *See* IDM at 8–9 n.45 (P.R. 171).[7]  Without these sources, the Court cannot assess the accuracy of Commerce's finding that they support including TEFLU's product within the scope.  Therefore, the Court should order a remand.

> **b.** **Commerce's Analysis of the (k)(1) Sources Was Unlawful, Inaccurate, And Must Be Remanded**

If the Court considers the substance of Commerce's analysis of the (k)(1) sources (in whole or in part), it will find that Commerce has not articulated a reasonable or lawful basis for including TEFLU's downstream products within the scope of the *Order*.  First, Commerce has not explained whether or how the scope language is ambiguous.  *Maquilacero I* prohibits Commerce from relying on the scope's silence to find that downstream products are covered by the *Order*.  Second, Commerce's characterizations of the (k)(1) sources—as set out in the *Remand*—are inaccurate and erroneous.  Simply put, the (k)(1) sources do not demonstrate that the *Order* covers downstream products produced by TEFLU.

---

[7] Should the Court choose to examine the (k)(1) sources, Maquilacero/TEFLU maintain that they do not support including TEFLU's products within the scope of the *Order*.  *See infra* <u>Section V.A.3.b.ii.</u>

AFSDOCS:304573682.1

i.        **Commerce Did Not Explain Whether or How the Scope Is Ambiguous**

Commerce has never identified, much less explained, the supposed ambiguity in the scope's language that permits Commerce to read the words "downstream products" into the scope. The scope of an order "may be interpreted as including subject merchandise only if {it} contain{s} language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel*, 296 F.3d at 1089.

Here, the plain language of the scope does not cover downstream or further processed items and no language within the scope can be reasonably interpreted to cover TEFLU's products. Indeed, in the *Remand*, Commerce relied on the silence of the scope language with respect to further processed merchandise to find that the scope is ambiguous. *See Remand* at 6 (observing that "the scope **does not address** further processed LWRPT," and concluding that "the plain language of the scope {is} ambiguous with respect to TEFLU's specific products as it includes **no language concerning further processing or downstream products**") (emphasis added).[8]  This Court explicitly prohibited Commerce from using silence in the scope's language as a basis for including downstream products within the scope. *See Maquilacero I*, 731 F.Supp.3d at 1356 ("The scope language's silence and lack of exclusionary provisions do not permit Commerce to conclude, based upon a plain language reading of the scope provisions, that TEFLU's further processed automotive products fall within the scope of the *Order*."). Commerce's claim that it is "no longer relying on the scope language's silence and in considering the scope's ambiguity" is disingenuous, at best. *Remand* at 6.

---

[8] This portion of the *Remand* is not on the record of this review.

Commerce's reliance on the silence or absence of language concerning downstream or further processed products stands in stark contrast to the case law. Specifically, in *Saha Thai*, there was no dispute that "dual-stenciled pipes are certified as 'standard pipe{s},' suitable for standard-pipe applications and in compliance with ASTM specifications." 101 F.4th at 1327 (alteration in original). The Federal Circuit explained that the term "standard pipes," as used in that order, meant "what it plainly sa{id}, 'standard pipe{s}.'" *Id*. The term could not be reasonably interpreted to mean "an unidentified subset within standard pipes that remains after another subset is excluded." *Id*. The Federal Circuit highlighted two key points in finding that the scope of the order could be read to include dual-stenciled pipes. First, the definition of "standard pipes"—as used in the order—clearly and indisputably covered dual-stenciled pipes. *Id*. Second, the order did not contain any exclusionary language that would remove dual-stenciled pipes from the scope. *Id*. at 1327–28. Put differently, the Federal Circuit identified specific language of the scope that could be interpreted as covering dual-stenciled pipes.

Unlike *Saha Thai*, TEFLU's parts which are cut, bent, perforated and otherwise processed are not suitable as LWRPT because the raw material LWRPT has been transformed into a downstream product. Further, the scope contains no reference to any specifications that would cover downstream products. *Compare Saha Thai*, 101 F.4th at 1329 ("As long as the pipes meet ASTM specifications, they are considered standard pipes."), with *Order*, 73 Fed. Reg. at 45404 ("The merchandise subject to these orders is certain welded carbon quality light–walled steel pipe and tube, of rectangular (including square) cross section, having a wall thickness of less than 4 mm."). In fact, the scope's references to the HTSUS numbers under which the subject merchandise may be classified constitute the only language in the scope that comes close to identifying the scope's breadth. *See Order*, 73 Fed. Reg. at 45404 ("The welded carbon-quality

25

rectangular pipe and tube subject to these orders is currently classified under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.61.50.00 and 7306.61.70.60."). As this Court pointed out in *Maquilacero I*, "{t}he fact that TEFLU's products are classified in HTSUS headings other than those listed in the <u>Order</u> supports the Court's conclusion that Commerce's plain language determination is not accordance with law."  731 F.Supp.3d at 1356.

Commerce makes no reference to the HTSUS subheadings in the *Final Results* despite arguments advanced by Maquilacero/TEFLU on that point.  *See* Maquilacero/TEFLU Case Br. at 13–15 (P.R. 157, C.R. 141).  The fact that HTSUS classifications are not ***dispositive*** does not mean they are not ***probative***.  Indeed, the description of merchandise classifiable under HTSUS subheadings 7306.61.50.00 and 7306.61.70.60 tracks the scope language to such an extent that Commerce should at least explain why the scope of subject merchandise is not conterminous with the scope of products classifiable under HTSUS subheadings 7306.61.50.00 and 7306.61.70.60:

AFSDOCS:304573682.1

| *Order* Scope Language<br>*Order*, 73 Fed. Reg. at 45404 (emphasis added) | HTSUS Language<br>United States International Trade Commission, *Harmonized Tariff Schedule of the United States* (2022 Revision 8) (emphasis added). |
|---|---|
| The merchandise subject to these orders is certain **welded** carbon quality light-walled **steel pipe and tube, of rectangular (including square) cross section**, **having a wall thickness of less than 4 mm**. | 7306: Other **tubes, pipes** and hollow profiles (for example, open seamed or **welded**, riveted or similarly closed), of iron or **steel**:<br><br>. . .<br><br>    7306.61: Other, welded, of noncircular cross section:<br>     Of **square or rectangular cross section**:<br><br>    . . .<br><br>        **Having a wall thickness of less than 4 mm**:<br>          7306.61.50: Of iron or nonalloy **steel**:<br><br>      . . .<br><br>        7306.61.70: Of alloy **steel**: |

The emphasized language above demonstrates the significant degree of overlap between the HTSUS and the *Order*'s scope. Commerce failed to explain its decision in light of this overlap or address the CBP's findings that downstream products are not classifiable under HTSUS 7306. *See* Maquilacero/TEFLU Case Br. at 13–15 (P.R. 157, C.R. 141); HQ H213699; HQ 560667. Commerce's failure to explain its scope determination in light of the narrower coverage of the HTSUS classifications provided in the scope's language must be remanded.

        ii.        **Commerce Did Not Accurately Characterize the (k)(1) Sources**

In *Maquilacero I*, this Court remanded Commerce's analysis of the (k)(1) sources for failing to "provide any substantive explanations" for how ITC reports support the agency's determination that TEFLU's further processed, customized auto parts are covered by the scope of

27

the *Order*. 731 F.Supp.3d at 1363. Commerce's subsequent characterization of these sources

was deficient in the *Remand*. Consequently, Commerce's reliance on these sources for the *Final*

*Results* remains lacking and should be remanded.

Commerce correctly acknowledged that the ITC reports identified "numerous

downstream products as end use applications of LWRPT," including "automative uses."[9] IDM at

9. However, Commerce attempted to distinguish TEFLU's products:

> While the ITC mentioned automotive uses among these applications, the example
> products identified clearly indicate that TEFLU's products, described as
> customized auto parts, are much less complex and do not lose the rectangular or
> square cross section through alteration of the piece of LWRPT or combination with
> other inputs.

*Id.* (citing *ITC Report –LWRPT from Turkey* at II-6). In context, the cited portion of the *ITC*

*Report –LWRPT from Turkey* does not mean what Commerce claimed.

The ITC mentioned "automative applications" as one of several end use applications or

products, along with "hydraulics, conduit{s}, gym equipment, structural members, handrails,

furniture, different types of fencing, racks, or shelving," but there is no meaningful discussion of

automative products on the relevant pages. *ITC Report –LWRPT from Turkey* at II-6. Commerce

offered no explanation for how this section is relevant to the Court's concerns in *Maquilacero I*

and merely reasserted that TEFLU's products are insufficiently complex compared to the

identified products and end uses to be considered an "automative use{}" product. IDM at 9 (P.R.

171). There is no evidence or analysis to support Commerce's speculation that [

] like the ones on the record which are used in [                                          ],

---

[9] The block quote from the *Remand* omits citations to the specific pages of the ITC reports upon
which Commerce relied. *See* IDM at 9 (P.R. 171). Maquilacero/TEFLU provide the page
citations to facilitate the Court's review.

Maquilacero AQR, Exh. A-6, (P.R. 71, C.R. 12), are not sufficiently "complex" to be downstream products.

Second, Commerce claimed that the ITC found that LWRPT subject to fabrication could nonetheless still be considered LWRPT. IDM at 9 (P.R. 171). Commerce noted that "{t}he ITC reported that the industry included processed LWRPT subject to severe fabrication, including bending." *Id.* A closer review of the of the report shows that solely "*One* firm, \*\*\*, stated that severe fabrication, such as bending or swaging, limits interchangeability." *ITC Report –LWRPT from Turkey* at II-11 to II-12 (emphasis added). Notwithstanding the comment of "***One*** firm," the ITC's determination did not discuss or conclude whether LWRPT customized through further processing into a specific part and sold as a part (as is the case with the TEFLU products), was considered LWRPT and was reported by this participant in its questionnaire responses to the ITC. In other words, the ITC's determination does not suggest that TEFLU's further processed products are interchangeable with raw inputs covered in the *Order*.

With respect to the *ITC Report – LWRPT from Mexico Second Review*, Commerce's (k)(1) analysis similarly mischaracterizes the ITC's findings. *See* IDM at 9 (P.R. 171). The ITC noted that six Mexican producers reported performing processing on LWRPT such as "cutting, bending, drilling, and perforation." *ITC Report – LWRPT from Mexico Second Review* at IV-21. But the ITC never suggested that these products were within the scope of the *Order*, made by the domestic industry at issue.

Moreover, Commerce's reliance on the *ITC Report – LWRPT from Mexico Second Review* is misplaced. The regulation permits Commerce to consider "{d}eterminations of the {ITC} pertaining to the order at issue, including reports issued pursuant to the {ITC's} initial investigation." 19 C.F.R. § 351.225(k)(1)(i)(D). Reading this regulation to permit Commerce to

29

treat an ITC determination from a second sunset review as if it were a determination from the initial investigation—as Commerce does—renders the language "including reports issued pursuant to the ITC's initial investigation" surplusage. Such a reading would allow Commerce to consider *any* descriptions of the merchandise made *after* the initial investigation so long as it is contained in an ITC determination. Commerce's focus on the *ITC Report – LWRPT from Mexico Second Review* also contravenes this Court's instructions to Commerce to address "*whether TEFLU's further processed products were within an industry that was investigated by the ITC*" in the original investigation. *Maquilacero I*, 731 F.Supp.3d at 1358 (emphasis in original).

Commerce attempted to rely on its decision in the final results of AR16–17, to support including TEFLU's downstream products within the scope. But Commerce's decision to include further processed LWRPT within the scope was based on silence of the *Order* with respect to downstream products. *See* AR16–17 IDM at 10 ("In this case, the scope does not include any language excluding LWRPT pipe and tube based on end use."). This is not a viable basis for including any product within the scope of an order, as this Court explained in *Maquilacero I*, 731 F.Supp.3d at 1356.

Finally, Commerce insisted that the HWRPT AR1 IDM and the HWRPT Inv. PDM support including TEFLU's downstream products in the scope of the *Order*.[10] However, both of these decisions investigated different products and industries. Commerce did not explain why a

---

[10] The quote also cited *IBC Cages* and Commerce's redetermination pursuant to the remand ordered by the CIT in *Stein Indus.*, 365 F.Supp.3d at 1373, as sources showing that Commerce will, on some occasions, find products to be outside the scope of the *Order*. IDM at 9 (P.R. 171). But Commerce never explained how those findings apply to this case. Commerce's reasoning on this point is, therefore, not reasonably discernable. *See NMB Sing.*, 557 F.3d at 1319 ("{T}he path of Commerce's decision must be reasonably discernable to a reviewing court.").

finding with respect to one industry informs the scope of an order covering a different industry. Moreover, the scope determination in HWRPT AR1 IDM involved a review of whether further processing transformed a product, which (as a result of the further processing) lost its rectangular cross section. HWRPT AR1 IDM at 13–17. Commerce did not explain how the further processing at issue in that case resembles the circumstances here, such that its decision in the HWRPT proceeding should apply.

A fair reading of the (k)(1) sources does not support finding that downstream products made from LWRPT are included within the scope of the *Order*. In *Maquilacero I*, the Court directed Commerce to conduct a fulsome review of the (k)(1) sources. Commerce's reasoning in the *Final Results* is deficient in that respect.

### B.     Commerce's Decision to Collapse Maquilacero and TEFLU Is Not Supported by Substantial Evidence And Otherwise Not in Accordance with the Law

#### 1.     Legal Framework

Pursuant to 19 C.F.R. § 351.401(f), Commerce may collapse "two or more affiliated producers" into a "single entity" if the following conditions are satisfied: "(1) the entities must be affiliated"; (2) the entities must have "production facilities for *similar or identical products* that would not require substantial retooling of either facility in order to restructure manufacturing priorities"; and (3) Commerce must find "a significant potential for the manipulation of price or production". "Commerce must consider the 'totality of circumstances' between all entities when it evaluates whether, for purposes of collapsing entities, there is significant potential for manipulation of price or production to circumvent antidumping duties." *Maquilacero I*, 731 F.Supp.3d at 1363-64 (quoting *Prosperity Tieh Enters. v. United States*, 965 F. 3d 1320, 1326 (Fed. Cir. 2020) and *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27346 (May 19, 1997) ("*Preamble*")). This analysis "requires an evaluation of all pertinent evidence."

AFSDOCS:304573682.1

*Maquilacero I*, 731 F.Supp.3d at 1364.

Commerce typically conducts a collapsing analysis under 19 C.F.R. § 351.401(f). However, collapsing under that regulation is permitted only where the affiliated parties all have "production facilities for similar or identical products." *Allied Tube & Conduit Corp. v. United States*, 127 F.Supp.2d 207, 221–22 (Ct. Int'l Trade 2000); *see also Viraj Grp. v. United States*, 476 F.3d 1349, 1356 (Fed. Cir. 2007) (holding that the second factor under 19 C.F.R. § 351.401(f) "requires similarity in the products produced, not in the facilities that produce them"). In *Maquilacero I*, the CIT remanded Commerce's collapsing analysis, and that same analysis is at issue in this review. 731 F.Supp.3d at 1363–64. The Court emphasized that an evaluation of whether Maquilacero and TEFLU produce "similar" or "identical merchandise" should take into account the fact that "TEFLU's further processed products may not be within the scope of the *Order* as downstream products." *Id.* at 1364.

While the regulation specifically applies to affiliated producers, Commerce claims that it has developed a policy of also collapsing non-producing affiliates, but only where there is concern regarding production or price manipulation. *See U.S. Steel Corp. v. United States*, 179 F.Supp.3d 1114, 1135–36 (Ct. Int'l Trade 2016) (upholding Commerce's collapsing of an exporter with its affiliated producers). To determine whether there is a significant potential for the manipulation of price or production, Commerce "may consider" the following "non-exhaustive" list in 19 C.F.R. § 351.401(f)(2):

> (i) The level of common ownership;
>
> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
>
> (iii) Whether operations are intertwined, such as through the sharing of sales and export information; involvement in production, pricing, and other commercial

AFSDOCS:304573682.1

decisions; the sharing of facilities or employees; or significant transactions between the affiliated parties.

This does not end the inquire because Commerce must still find that the potential for manipulation is "significant." Collapsing requires a "significant potential for manipulation," not merely "*any* potential for price manipulation."' *Echjay Forgings Priv. Ltd. v. United States*, 475 F.Supp.3d 1350, 1374 (Ct. Int'l Trade 2020) (emphasis in original) (citation omitted). A collapsing determination requires "evidence that there is more than the 'mere possibility' that significant potential for manipulation could occur." *Hontex Enter. v. United States*, 248 F.Supp.2d 1323, 1345 n.19 (Ct. Int'l Trade 2003) (citation omitted).

### 2.    Additional Background

Throughout this review, Commerce has relied on its decisions in prior administrative reviews to collapse Maquilacero and TEFLU. *See, e.g.*, PDM at 1 n.1 (P.R. 115) (citing *AR18–19 Final Results*, 86 Fed. Reg. 33646). Maquilacero/TEFLU urged Commerce to reconsider its collapsing determination. *See* Maquilacero/TEFLU Case Br. at 20; *see also id.* at 18–21 (P.R. 157, C.R. 141).

Despite Maquilacero/TEFLU's arguments, Commerce continued to collapse Maquilacero and TEFLU into a single entity for the *Final Results. See* IDM at 10–12 (P.R. 171). Commerce relied on its practice of collapsing companies that have been collapsed in previous segments, "unless there is a basis to reevaluate the determination itself." *Id.* at 11. Commerce insisted that this Court's decision in *Maquilacero I* did not require Commerce to reevaluate its collapsing determination because "this litigation is not final or conclusive." *Id.* In Commerce's view, only evidence "of change in ownership, management, operations, and changes in merchandise produced" would warrant revisiting its collapsing determination. *Id.* at 12 (citation omitted). With respect to the factors at 19 C.F.R. § 351.401(f), Commerce summarily concluded that

33

Maquilacero and TEFLU "are affiliated through common ownership, they have overlapping board members, and they have intertwined operations." *Id.* at 11.

> ### 3. Commerce Failed to Address Evidence Showing that Maquilacero And TEFLU Do Not Produce Similar Merchandise or That One May Manipulate the Pricing or Production of the Other

First, Commerce's reliance on 19 C.F.R. § 351.401(f) cannot be sustained.  Commerce cannot collapse two companies under the regulation unless it demonstrates that the companies "have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities." *Carpenter Tech. Corp. v. United States*, 510 F.3d 1370, 1373 (Fed. Cir. 2007) (quoting 19 C.F.R. § 351.401(f)(1)). This inquiry focuses on whether the "production facilities of one company could be retooled to make a product identical to that produced by the other companies, including the existing production facilities and the equipment to be added." *Echjay Forgings*, 475 F.Supp.3d at 1370. Courts often consider the cost of retooling based on the companies' financial positions. *See id*. Commerce failed to conduct any analysis of these factors.

Specifically, Maquilacero makes LWRPT but lacks facilities and equipment that can further process that LWRPT into a downstream product as TEFLU does. *See* TEFLU BQR at 5–6 (P.R. 71, C.R. 35).  On the other hand, TEFLU purchases and consumes—not produces— LWRPT. *See* Maquilacero AQR, Exh. A-4 (P.R. 48, C.R. 12).  TEFLU's facilities house equipment that can further process LWRPT that is already made (by Maquilacero) but cannot make LWRPT itself. *See id.*  One company could not "retool" its facilities to make an identical product as the other company without substantial cost (purchasing all new equipment). *Cf. Echjay*, 475 F.Supp.3d at 1370.

AFSDOCS:304573682.1

Further, the equipment cannot be easily transferred between facilities of the two companies—they are located in different cities. Maquilacero produces all of the subject merchandise that it sells in Mexico and the United States in "a single production plant in San Nicolas de Los Garza, Mexico." Maquilacero AQR at 5, 9 (P.R. 48, C.R. 12). Conversely, while TEFLU has a production facility in San Nicolas de los Garza, Monterrey, its main production site is located in a different city, Puebla. *See* Maquilacero AQR at 5, 9–10 (P.R. 48, C.R. 12); TEFLU CQR at 33 (P.R. 72, C.R. 38). Commerce failed to address this evidence in the *Final Results*.[11]

Second, the degree of affiliation between Maquilacero and TEFLU does not suggest the potential for significant manipulation of price or production.[12] "{C}ollapsing requires a finding of more than mere affiliation." *Preamble*, 62 Fed. Reg. at 27345. Rather, Commerce must consider the "totality of the circumstances," *Prosperity Tieh*, 965 F.3d at 1327, and support a collapsing decision with "evidence that there is more than the mere possibility that significant potential for manipulation," *Hontex*, 248 F.Supp.2d at 1345 n.19 .

---

[11] In the *AR18–19 Final Results*, Commerce concluded that "because TEFLU performs further processing of in-scope merchandise, the input which is purchased from Maquilacero, and the processing of which does not change the product's physical characteristics resulting in different CONNUMs, there is a potential for the restructure of certain manufacturing priorities." AR18–19 IDM at 28. This conclusion completely misses the point. Different machinery is used to make a product than the machinery used to further process the product after it is made. If Machine A makes widgets from raw materials, and Machine B processes those widgets into custom-made car parts, that does not mean that Machine B can process the raw materials or that Machine A can perform the custom-processing required by the car industry. Machine A cannot perform the job of Machine B without substantial retooling.

[12] Maquilacero/TEFLU do not contest that there is common ownership or managerial overlap between Maquilacero and TEFLU, and do not take issue with Commerce's findings that the circumstances of this case satisfy 19 C.F.R. § 351.401(f)(2)(i) and (ii).

AFSDOCS:304573682.1

Maquilacero and TEFLU do not have overlapping operations that suggest that one company influences the pricing or production of the other. For example, Maquilacero and TEFLU forecast sales differently because TEFLU's products are customer-specific and product-specific, and the two companies serve different customers and make different products. *See* Maquilacero AQR at 19–24, Exhs. A-8A, A-8H (P.R. 48, C.R. 12, 14); *see also* TEFLU BQR at 30–31 (describing TEFLU's inventory practices). Neither company can manipulate the pricing or production of the other and still serve their customers. Commerce failed to address this evidence, and its failure requires a remand. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (noting that an agency determination is "arbitrary and capricious" if the agency "failed to consider an important aspect of the problem"); *see Prosperity Tieh*, 965 F.3d at 1327 (requiring Commerce to examine "all pertinent evidence") (citation omitted).

### C.    Commerce's Use of Quarterly Averages to Calculate the COM is Not Supported by Substantial Evidence

"{T}he statute does not prescribe a specific time period over which cost of production must be calculated." *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F.Supp.2d 1230, 1235 (Ct. Int'l Trade 2011), *aff'd sub nom. Pastificio Garofalo, S.P.A. v. United States*, 469 F. App'x 901 (Fed. Cir. 2012). "Commerce normally calculates a weighted-average cost for the period of review to determine cost of production, but it may depart from its normal practice when Commerce's normal method would distort the dumping analysis due to significant cost changes." *Officine Tecnosider SRL v. United States*, No. 23-00001, 2025 WL 2602551, at *3 (Ct. Int'l Trade Sept. 3, 2025) (citation omitted). Commerce may use its quarterly cost methodology when two conditions are satisfied: (1) "there are significant changes in the cost of production during the" POR (*i.e.*, there is a greater than 25% change in costs between the high and low

36

quarters of the review period); and (2) "that sales made during the shorter cost-averaging periods {can} be reasonably linked" with the cost of production during the same periods.  *Id*. (citation omitted) (alteration in original).

In the *Preliminary Results*, Commerce found that necessary prerequisites for the quarterly cost methodology were satisfied and applied the quarterly cost methodology.  PDM at 14–15, (P.R. 115).  In evaluating the first criterion, Commerce found that record evidence shows that Maquilacero/TEFLU "experienced **significant** cost changes (*i.e.*, changes that exceeded 25 percent) between the high and low quarterly COM for the majority of the five highest sales volume product control numbers (CONNUMs) in the comparison and U.S. markets during the POR."  *Id.* at 15 (emphasis added).  In other words, even though five of the top ten CONNUMs exhibited changes of greater than 25%, Commerce determined this change satisfied the first criterion.

With respect to the second criterion, Commerce found the necessary correlation between production costs and the shorter (quarter) averaging periods.  *Id.*  In fact, the cost data in this review show a very strong correlation for each of the CONNUMs tested.  Specifically, [     ] out of the [     ] tested quarters, or [       ] of the quarters, show that changes in COM move in the same direction as changes in sales price.  Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. Preliminary Analysis Memorandum, Attach. 5B (Sept. 6, 2024) (C.R.128).  Thus, Commerce preliminary applied the quarterly cost methodology to calculate Maquilacero/TEFLU's COM.  *See* PDM at 14–15 (P.R. 115).

In the *Final Results*, Commerce inexplicably reached the opposite conclusion although the underlying facts remained unchanged.  Commerce claimed that the 25% threshold (under the first criterion) "was met for five of the ten CONNUMs analyzed."  IDM at 14 (P.R. 171).

AFSDOCS:304573682.1

Commerce found that the 25% threshold for differences in COM did not apply to more than half of the CONNUMs examined. *Id.* at 15. Maquilacero/TEFLU pointed out that in *Certain Pasta From Italy*, Commerce was confronted with similar facts: a "50/50 split." Maquilacero/TEFLU's Rebuttal Br. at 6 (P.R. 162, C.R. 148) (citing *Certain Pasta From Italy: Notice of Final Results of 15th Antidumping Duty Administrative Review, Final No Shipment Determination and Revocation of Order, in Part; 2010-2011*, 78 Fed. Reg. 9364 (Dep't Commerce Feb. 8, 2013), and accompanying Issues and Decision Mem. at 10 ("Pasta from Italy IDM")). Despite this 50/50 split, Commerce used the quarterly cost methodology because it would help minimize the distortions that significant changes in quarterly costs may have on the dumping margin calculation. *See* Pasta from Italy IDM at 10. Commerce rejected Maquilacero/TEFLU's reliance on *Pasta from Italy* by claiming "{i}n that proceeding, Commerce applied its quarterly cost methodology after finding significant changes in COM." IDM at 15 (P.R. 171). In other words, Commerce claimed that its analysis in that case responded to the second criterion of its two-part test—not the first. Therefore, Commerce used Maquilacero/TEFLU's POR costs to calculate the COM. *Id.* at 14–16.

The problem with Commerce's finding is that it abruptly changed its position in the *Final Results* without a change in the underlying data and without distinguishing *Pasta from Italy*. Although Commerce's analysis in that case focused on the 50/50 split as it applies to the second criterion, Commerce conclusion shows that, as a general matter, when faced with a 50/50 split in the context of its quarterly cost methodology, Commerce breaks the tie. According to *Pasta from Italy*, Commerce should break the tie based on whether using quarterly costs would help minimize the distortion that significant changes in quarterly costs has on the dumping margin

38

calculation.  Commerce failed to meaningfully engage with Maquilacero/TEFLU's arguments on this point, and its use of POR costs should be remanded.

### D.    Commerce's Use of a Smoothing Adjustment is Not Supported By Substantial Evidence and Otherwise Not in Accordance with the Law

#### 1.    Legal Framework

The statute requires Commerce to calculate costs "based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country. . .  and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).  Commerce may "adjust costs to address distortions when it encounters cost differences that are attributable to factors beyond differences in the products' physical characteristics."  *Dongkuk S&C Co. v. United States*, 600 F.Supp.3d 1331, 1335–36 (Ct. Int'l Trade 2022), *aff'd*, 134 F.4th 1320 (Fed. Cir. 2025) (citation omitted).  In making this assessment, Commerce must consider "all available evidence submitted by the respondent regarding the proper allocation of costs."  *Dongkuk S&C Co. v. United States*, 134 F.4th 1320, 1327 (Fed. Cir. 2025) (citation omitted).  The "mere presence of some unusual cost differences within the reported data does not provide sufficient evidence for Commerce to reject costs that were based on the respondent's normal books."  IDM at 18 (P.R. 171); *see also Low Melt Polyester Staple Fiber From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 14332 (Dep't Commerce Mar. 8, 2023), and accompanying Issues and Decision Mem. at 14 ("LMPSF from Korea IDM"); *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 32720 (Dep't Commerce July 9, 2019), and accompanying Issues and Decision Mem. at 11 ("HRS from Korea IDM"); *Common Alloy Aluminum Sheet From Italy: Final Affirmative Determination of Sales at Less*

*Than Fair Value (LTFV)*, 86 Fed. Reg. 13309 (Dep't Commerce Mar. 8, 2021), and accompanying Issues and Decision Mem. at 32 ("CAAS from Italy IDM"); *Certain Cut-to-Length Carbon-Quality Steel Plate Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 85 Fed. Reg. 27362 (Dep't Commerce May 8, 2020), and accompanying Issues and Decision Mem. at 16 ("CTL from Korea IDM").

Additionally, it is a firmly established principle of administrative law that an agency must "come to grips with conflicting precedent" to avoid "an inexcusable departure from the essential requirement of reasoned decision making." *NLRB v. CNN Am., Inc.*, 865 F.3d 740, 751 (D.C. Cir. 2017) (quoting *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003)); *Katunich v. Donovan*, 599 F.Supp. 985, 986 (Ct. Int'l Trade 1984) ("It is a sound principle of administrative law that an administrative agency must either follow or adhere to existing policies and precedents or explain its non-compliance or deviation."). Commerce must explain its "reasons for treating similar situations differently" or its decision is arbitrary and must be remanded. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)); *Calgon Carbon Corp. v. United States*, 487 F.Supp.3d 1359, 1365 (Ct. Int'l Trade 2020).

### 2.    Additional Background

In past reviews of the *Order*, Commerce has not taken issue with Maquilacero/TEFLU's methodology for reporting materials costs. Commerce's initial questionnaire instructed Maquilacero/TEFLU to report the same six product characteristics that Commerce used to construct the CONNUMs in past reviews. *See, e.g.*, Maquilacero CQR at 14–18 (P.R. 73, C.R. 41).

In response to a supplemental questionnaire, Maquilacero/TEFLU explained that "that the primary difference among the average coil costs is whether the coil was [

]." *See* 1SQR at 15 & Exh. S-30(B) (P.R. 108, C.R. 81, 93). That summary showed that, on average, the total cost of [                ] coils compared to [                ] coils varied by about

[                ], per CONNUM.  *See* 1SQR, Exh. S-30(B) (P.R. 108, C.R. 93).

Prior to Maquilacero/TEFLU's response to the supplemental questionnaire, Commerce was aware that steel coil costs had a significant influence on the COP.  Maquilacero reported that "coil cost accounted for approximately [      ]% of Maquilacero's costs of manufacturing during the POR."  Maquilacero S.A. de C.V.'s Section D Questionnaire Response at 7 (Jan. 17, 2024) (P.R. 73, C.R. 44).  Indeed, Maquilacero provided data to Commerce showing that the average cost of purchasing steel coils varied between [                ] on the low end and [

] on the high end during the POR.  *See id.*, Exh. D-3.  The only additional information that Commerce obtained in response to the supplemental questionnaire was a more granular understanding of the impact of coil costs across similar products.

Following the *Preliminary Results*, Petitioner urged Commerce to disregard Maquilacero/TEFLU's normal books and records in favor of a cost-smoothing adjustment that lowered the overall cost of production and increased the overall dumping margin.  *See* Petitioner's Case Br. at 10 (P.R. 158, C.R. 142).   Petitioner alleged that the smoothing adjustment was necessary because "significant cost differences between CONNUMs with the same steel inputs raise{d} concerns about whether the reported costs accurately reflect{ed} the physical characteristics of the CONNUMs."  *Id.*

In response, Maquilacero/TEFLU explained that their reporting methodology for product-specific costs "has not changed in recent reviews."  Maquilacero/TEFLU Rebuttal Br. at 7 (P.R.

AFSDOCS:304573682.1

162, C.R. 148). Maquilacero/TEFLU highlighted that their costs "were calculated on a product code-specific basis – a more detailed level of product specificity than the CONNUM, which reflect the actual material and conversion costs incurred during the POR in manufacturing the subject merchandise." *Id.* at 8. Maquilacero/TEFLU urged Commerce to reject Petitioner's proposed smoothing adjustment because: (1) Commerce had established a practice and policy of accepting Maquilacero/TEFLU's normal books and records as reasonably reflecting the product costs; and (2) as Commerce has found in cases like *LMPSF from Korea*, the mere presence of some unusual costs differences within Maquilacero/TEFLU's reported data did not justify rejecting Maquilacero/TEFLU's books and records as unreliable. *See* Maquilacero/TEFLU Case Br. at 7–11 (significant variation).

In the *Final Results*, Commerce sided with Petitioner. Commerce defined "significant variation" as a difference of [          ] in hot-rolled coil ("HRC") costs, when comparing the HRC costs for a particular CONNUM to the average HRC costs. Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. Final Analysis Memorandum, Attach. 6 (June 10, 2025) ("Final Analysis Mem.") (P.R. 174, C.R. 158). Commerce found that [      ] of Maquilacero/TEFLU's CONNUMs passed this [            ]. *Id.* Commerce concluded that "Maquilacero/TEF{L}U's reported costs based on its normal books and records do not reasonably reflect the cost to produce LWRPT" and applied a smoothing adjustment. *Id.* at 5 (P.R. 174, C.R. 152); *see also* IDM at 17–18 (P.R. 171). However, Commerce never explained how deviating from Maquilacero/TEFLU's normal books and records in this review comports with its practice and policy in past reviews.

Additionally, in the Final Analysis Memorandum, Commerce claimed that "there are *some* significant cost differences that appear to be independent of the physical differences in

42

products," which warrant a smoothing adjustment.  Final Analysis Mem. at 5 (P.R. 174, C.R.

152) (emphasis added).  Yet, in the Issues and Decision Memorandum, Commerce reiterated its

practice that the "mere presence of *some* unusual cost differences within the reported data does

not provide sufficient evidence for Commerce to reject costs that were based on the respondent's

normal books."  IDM at 18 (P.R. 171) (emphasis added).  Commerce never explained its

contradictory reasoning or addressed cases like *LMPSF from Korea* where Commerce has

refused to apply a smoothing adjustment solely based on "some" unusual costs.

### 3.    Commerce Failed to Reasonably Explain Why Maquilacero/TEFLU's Normal Books And Records Were Unreliable And Broke with Established Practice

Maquilacero/TEFLU request that this Court remand Commerce's refusal to rely on

Maquilacero/TEFLU's normal books and records to calculate the COP and its use of a smoothing

adjustment for two reasons.  First, Commerce's finding that Maquilacero/TEFLU's normal books

and records do not reasonably reflect the costs to produce and sell subject merchandise—based

on "some" unusual cost differences—is not supported by the record and inconsistent with

Commerce's practice.  Second, Commerce failed to articulate any explanation for departing from

past reviews of the *Order* where Commerce has accepted Maquilacero/TEFLU's books and

records as reasonably reflecting costs.

On the first point, Commerce's contradictory reasoning on whether "some" unusual cost

differences warrant departure from Maquilacero/TEFLU's books and records requires a remand.

Commerce simultaneously acknowledges that "some unusual cost differences" does not

demonstrate that a respondent's books and records are unreliable, *id.*, while maintaining that

"some" unusual cost difference (*i.e.*, [                                    ]) justify rejecting

Maquilacero/TEFLU's normal books and records, Final Analysis Mem. at 5 (P.R. 174, C.R. 152).

This contradiction is fatal to Commerce's use of a smoothing adjustment and requires a remand. *See NMB Sing.*, 557 F.3d at 1319 ("{T}he path of Commerce's decision must be reasonably discernable to a reviewing court.").

Moreover, Commerce has found in several cases that "some cost outliers, {which} account for only a small amount in relation to the totality of the reported production information" do not justify rejecting a respondent's normal books and records in favor of a smoothing adjustment. LMPSF from Korea IDM at 14; *see also* HRS from Korea IDM at 11 (declining to use a smoothing adjustment when "there were some fluctuations in material costs, between similar products, {but} they were not on the whole significant or frequent"); CTL from Korea IDM at 16 ("While there are some outliers, these outliers are insignificant in relation to the totality of the reported production information."). It is not at all apparent, and Commerce did not explain, how cost differences of [        ] affecting less than [        ] of Maquilacero/TEFLU's CONNUMs connote anything more than "some cost outliers." LMPSF from Korea IDM at 14. Indeed, Commerce was comfortable with data showing that coil costs drove cost differences in CONNUMs by about [            ] or more for each product, as Maquilacero reported in response to the Section D Questionnaire, but inexplicably found [

                    ] were intolerable. 1SQR, Exh. S-30(B) (P.R. 108, C.R. 93). Commerce's failure to consider and address this evidence requires a remand. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (noting that an agency determination is "arbitrary and capricious" if the agency "failed to consider an important aspect of the problem").

With respect to the second point, Commerce cannot avoid its obligation to come to grips with its decisions in prior reviews in which it accepted Maquilacero/TEFLU's methodology for reporting costs based on their normal books and records. IDM at 17 (P.R. 171). Again, once

Commerce established a practice it must adhere to or justify departing from that practice.  *See SKF USA*, 263 F.3d at 1382; *NLRB v. CNN Am., Inc.*, 865 F.3d at 751; *NMB Sing.*, 557 F.3d at 1328 (remanding to Commerce and explaining that "{o}nce Commerce establishes a course of action . . . Commerce is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary"); *DAK Ams. LLC v. United States*, 456 F.Supp.3d 1340, 1346 (Ct. Int'l Trade 2020) ("Consistency promotes fairness between parties, predictability that is critical to the administration of justice, and protects against arbitrary and capricious conduct by the institutions that issue determinations and decide disputes.").

        While each review is a separate exercise of Commerce's authority, Commerce is not free to make different decisions when faced with substantially similar facts without explaining why differing treatments are warranted.  *See, e.g.*, *Calgon Carbon*, 487 F.Supp.3d at 1366 (remanding Commerce's use of a surrogate data to value a factor of production as inconsistent with treatment of the same data in prior administrative reviews); *Solarworld Ams., Inc. v. United States*, 182 F.Supp.3d 1372, 1379 (Ct. Int'l Trade 2016) (finding that Commerce did not provide an explanation for its disparate treatment even though Commerce may have had a reasonable basis for doing so). Commerce must explain its "reasons for treating similar situations differently." *SKF USA*, 263 F.3d at 1382 (citation omitted).  A bald assertion that each review must stand on its own does not provide the requisite explanation.  *See Mid Continent Steel & Wire, Inc. v. United States*, 551 F.Supp.3d 1360, 1366 (Ct. Int'l Trade 2021) (finding that Commerce's justification that "the record of each case stands on its own" did "not explain or identify any difference between the two cases that would lead to such different treatment") (citation omitted); *Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. v. United States*, 413 F.Supp.3d 1347, 1358

AFSDOCS:304573682.1

(Ct. Int'l Trade 2019) (finding that "a bald assertion" did not constitute "a reasonable explanation").

In all prior administrative reviews of the *Order* in which Maquilacero and TEFLU have participated, Commerce accepted Maquilacero/TEFLU's normal books and records as reasonably reflective of the cost to produce subject merchandise. Commerce established a practice of accepting Maquilacero/TEFLU's books and records as reliably reflecting the costs associated with the production of subject merchandise. Commerce does not dispute this point. Maquilacero/TEFLU were entitled to rely on that practice in reporting costs to Commerce, consistent with the product characteristics Commerce identified in the questionnaires.

Maquilacero/TEFLU track the costs associated with steel coil inputs and was able to fully respond to Commerce's information requests as to those costs. *See* 1SQR at 15 & Exh. S-30(B) (P.R. 108, C.R. 81, 93). In other words, the costs at issue are reflected in Maquilacero/TEFLU's normal books and records.

In short, there is no evidence on the record undermining the reliability of Maquilacero/TEFLU's books and records—only evidence supporting their reliability. Therefore, Commerce's use of a smoothing adjustment is not supported by substantial evidence. Moreover, Because the path of Commerce's reasoning is not clear and Commerce deviated from past practice without any explanation, Commerce's decision is not in accordance with the law. Maquilacero/TEFLU respectfully request that this Court remand Commerce's application of a smoothing adjustment to Maquilacero's COP.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Maquilacero/TEFLU ask this Court to grant its motion for judgment on the agency record and remand the *Final Results*, as amended by the *Amended Final*

*Results*, with instructions for Commerce to reconsider Commerce's: (1) decision that TEFLU's

downstream, further processed products are within the scope of the *Order*; (2) decision to

collapse Maquilacero and TEFLU; (3) use of period-wide averages to determine

Maquilacero/TEFLU's COM; and (4) decision to disregard Maquilacero/TEFLU's normal books

and records in favor of using a smoothing adjustment to calculate the COP.

<div style="margin-left: 40%;">

Respectfully submitted,

**/s/ Diana Dimitriuc Quaia**
Diana Dimitriuc Quaia
John M. Gurley
Yun Gao
Tyler J. Kimberly
Christian L. Bush

ARENTFOX SCHIFF LLP
1717 K Street, NW
Washington, D.C. 20006
Tel: (202) 857-6291
Fax: (202) 857-6395
Email: diana.dimitriuc-quaia@afslaw.com

*Attorneys for Maquilacero S.A. de C.V. and*
*Tecnicas De Fluidos S.A. de C.V.*

</div>

Dated: December 17, 2025

47

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), and the Scheduling Order

(Nov. 26, 2025), ECF No. 41, the undersigned certifies that Plaintiffs' Brief accompanying their

Motion for Judgment on the Agency Record, filed on December 17, 2025, complies with the

word limitation requirement.  The word count for the brief, as computed by ArentFox Schiff

LLP's word processing system, is 13,651.


  **/s/ Diana Dimitriuc Quaia**
      Diana Dimitriuc Quaia

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| MAQUILACERO S.A. DE C.V. AND TECNICAS DE FLUIDOS S.A. DE C.V., <br><br> *Plaintiffs*, <br><br> PRODUCTOS LAMINADOS DE MONTERREY S.A. DE C.V., <br><br> *Plaintiff-Intervenor*, <br><br> v. <br><br> THE UNITED STATES, <br><br> *Defendant*, <br><br> NUCOR TUBULAR PRODUCTS INC., <br><br> *Defendant-Intervenor*. | **Court No. 1:25-cv-00176-JCG** |

## ORDER

Upon consideration of the Motion for Judgment on the Agency Record Regarding submitted by Plaintiffs Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. (collectively, "Plaintiffs"), pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade ("CIT Rules"), and upon consideration of all other papers and proceedings herein, it is hereby

**ORDERED** that Plaintiffs' CIT Rule 56.2 Motion for Judgment on the Agency Record Regarding is GRANTED; and it is further

**ORDERED** that the final results issued by the U.S. Department of Commerce ("Commerce") in the administrative review challenged in this case, *Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 25232 (Dep't Commerce June 16, 2025), as amended by *Light-Walled*

*Rectangular Pipe and Tube and Mexico: Amended Final Results and Partial Recission of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 38751 (Dep't Commerce Aug. 12, 2025), are reversed and remanded to Commerce for disposition consistent with the opinion of the Court.

       **SO ORDERED**.

                                   _____

                                  The Hon. Jennifer Choe-Groves, Judge

Date: _____
       New York, New York